# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Criminal No. 19-368 |
| | ) | |
| JUSTIN ASH | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, through undersigned counsel, respectfully submits the Government's Sentencing Memorandum as to defendant Justin Ash, in accordance with U.S.S.G. § 6A1.2. Based on an appropriate calculation under the advisory Sentencing Guidelines and a review of the applicable sentencing factors enumerated in 18 U.S.C. § 3553(a), the Court should impose a sentence consistent with the Guidelines, including a period of incarceration of not more than 30 months.

**I.      Procedural Background and Summary of Offense Conduct**

On December 10, 2019, the defendant Justin Ash was charged by way of a one-count Information with conspiracy to smuggle misbranded drugs and introduce them into interstate commerce, in violation of 18 U.S.C. § 371. Doc. No. 1. On January 16, 2020, pursuant to a written plea agreement, the defendant entered a knowing and voluntary plea of guilty to the charge offense. Doc. No. 12.

During his plea hearing, the defendant admitted that between January 2016 and May 8, 2018, he engaged in a conspiracy to obtain unapproved drugs in bulk quantities from overseas suppliers, including suppliers in China, for the purpose of pressing the drugs into pills and distributing them to customers throughout the United States via his internet-based business Domestic RCS ("DRC"). The defendant's website, www.domesticrcs.com, advertised multiple unapproved or "misbranded" drugs—clonazolam, diclazepam, flubromazolam, and etizolam—

each of which was a non-prescription benzodiazepine or substance with a similar chemical composition. As the defendant further acknowledged, these substances carried risks of dependency, toxicity, and even fatal overdose, particularly when combined with other central nervous system depressants.

Although his website and the packaging contained in his shipments indicated that the substances were for "research purposes only," the defendant admitted that he was aware that the vast majority of his customers purchased the drugs for individual consumption. Indeed, the defendant or others acting at his direction communicated directly with individual customers about, among other things, the effects of the drugs when used for personal consumption. In an effort to evade detection by United States federal authorities, including the United States Food and Drug Administration, United States Postal Inspection Service, and United States Customs and Border Protection, the defendant also admitted that he caused his overseas suppliers to ship drugs to multiple addresses under his control and in smaller quantities that would draw less government scrutiny. *See* Doc. No. 380 (PSIR) ¶¶ 9-19.

As part of the defendant's guilty plea, he agreed that the applicable loss, based on his business revenues, was greater than $550,000 but not more than $1,500,000. He further agreed to forfeit approximately $230,000 in currency seized from his home and a bank account under his control, and to the entry of a forfeiture money judgment in the amount of $550,000. *Id.* ¶¶ 5, 20.

Sentencing is scheduled for November 18, 2020.

II. **Argument**

    A. **The Sentencing Guidelines**

Although the Supreme Court rendered the federal Sentencing Guidelines advisory in *United States v. Booker*, 543 U.S. 220 (2005), a sentencing court is still required to "consult [the] Guidelines and take them into account when sentencing." *Id.* at 264. The Supreme Court has

directed that district courts "begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38 (2007). The sentencing court, however, "may not presume that the Guidelines range is reasonable." *Nelson v. United States*, 550 U.S. 350, 352 (2009). The "Guidelines should be the starting point and the initial benchmark," but the sentencing court must also "consider all of the § 3553(a) factors" in determining the appropriate sentence. *Gall*, 552 U.S. at 49-50. Ultimately, the sentence imposed must meet a standard of reasonableness. *Booker*, 543 U.S. at 260-61.

The defendant's presentence investigation report (PSIR) arrived at a total offense level of 19 based on the following Sentencing Guidelines calculation:

| | | |
|---|---|---|
| Base Offense Level (§ 2B1.1(a)(2)) | | 6 |
| Loss (§ 2B1.1(b)(1)(H)) | + | 14 |
| Role Enhancement (§ 3B1.1(c)) | + | 2 |
| Acceptance of Responsibility (§ 3E1.1) | - | 3 |
| Total Offense Level | = | 19 |

PSIR ¶¶ 24-34. The defendant has a Criminal History Category of I, *id.* ¶ 37, resulting in an applicable advisory Guidelines imprisonment range of 30 to 37 months. *Id.* ¶ 72. Pursuant to the plea agreement entered into by the parties, the United States has agreed to seek a sentence of no greater than the bottom of the Guidelines range—i.e., 30 months' incarceration. The Guidelines calculation adequately accounts for the defendant's conduct, and the Court should impose a sentence of incarceration of no more than 30 months.

B.  **Analysis of the § 3553(a) Factors**

Based on a review of the applicable statutory sentencing factors codified in 18 U.S.C. § 3553(a), the United States believes a sentence that includes a term of incarceration of no more

than 30 months is appropriate in this case. For sentencing purposes, the government will highlight what it believes are the most relevant statutory factors.

### 1. The Nature, Circumstances, and Seriousness of the Offense, and the History and Characteristics of the Defendant

For the better part of two-and-a-half years, the defendant orchestrated a smuggling/misbranding conspiracy involving the illicit distribution of dangerous drugs—benzodiazepines or substances with similar chemical structure and effects—to individuals throughout the United States. He did so without any real regard for the way in which the drugs (i.e., the defendant's product) were used—or abused. And he did all of this for one simple reason: greed. In doing so, he put his own profit motive above any concern for the safety of his many customers. Indeed, the defendant likely had no idea who the vast majority of his customers actually were; to him they were simply credit card numbers and email addresses on the other end of an online transaction processed through his business's website. Anyone—literally anyone—could obtain these foreign-sourced drugs from the defendant and his co-conspirators by logging onto the internet and ordering a shipment via www.domesticrcs.com.

In order to pull off the scheme for as long as he did, the defendant engaged in conduct designed to mask his actions—he smuggled the drugs into the United States. He and his co-conspirators did so by having their overseas suppliers ship the drugs to multiple addresses controlled by the defendant and in smaller quantities that would draw less government scrutiny. As the defendant has further admitted, he took these steps to evade detection by at least three federal agencies—the Food and Drug Administration, the United States Postal Inspection Service, and Customs and Border Protection.

The seriousness of this conduct cannot be overstated. By acting outside the law to import dangerous and wholly unregulated drugs—manufactured in a foreign country, no less—and then

distribute them to uninformed customers for their personal consumption, the defendant acted with grave recklessness. To that end, the United States is submitting as exhibits to this memorandum, examples of email correspondence sent to DRC email account that make clear, in the starkest most desperate terms, the gravity of the defendant's conduct. *See* Ex. 1.

In one email, dated January 10, 2017, a woman contacted the defendant's business email account (drcservicedirect@gmail.com) about her brother who was abusing the defendant's products:

> Please stop selling your drugs to my brother []. He ended up in the hospital and our mom confiscated your little bag of pills that you sent him. The Minnesota state police also showed up to the hospital and evaluated him for being suicidal.
>
> You are literally going to kill him and he told our mom that he buys from you and 2 other companies.

*Id.* at 1.

Another email chain from 2016 tells a similar story. In an email on September 4, 2016, a customer inquired about DRC's clonazolam supply, questioning the quality of the pills: "I'm still not sure that the clonazolam Pellets contain anything near what was advertised." *Id.* at 2. Later in the chain on the same day, the customer received a response from the defendant's business email account, indicating that there was a bad batch of the drugs at one point but purportedly not the batch from which the customer received his shipment: "Your shipment was on a good supply of pellets that were verified so to be as advertised[;] we destroyed our inventory that had a bad batch mixed in on the 28th your shipment was the 29th so they were unaffected are you making a complaint about them?" *Id.*

The next day, the customer appears to have forwarded the communications he had with the defendant's company to a close friend or loved one, who wrote a troubling email to the defendant's company in which she disclosed that the customer was a drug addict who had recently overdosed.

The email is worth reproducing in full here, as it lays bare the significant human toll of the defendant's conduct:

> A customer of yours who emailed with you on Sept. 4 about pellets and other RCs [research chemicals] is a benzodiazepine addict. See email thread below. In early June, he OD'd, was saved by me when I performed cpr on him in front of his 3 year old daughter, was flown by helicopter to the nearest hospital, and spent 8 days there including 2 on a ventilator. He has since been in both inpatient rehab and outpatient rehab. Please, for the sake of his little girl who loves him to the moon and back, stop supplying him. I know he can turn elsewhere but for right now you are his source and he will die if he keeps using. Then, he won't be anyone's customer or anyone's father.

*Id.* at 1.

Notwithstanding the fact that the defendant and his co-conspirators were on notice that real people were being affected and suffering grave consequences as a result of their sale of misbranded drugs, the defendant continued selling drugs via his website until law enforcement officers executed search warrants at his home in May 2018—approximately twenty months after the September 5 email. This conduct reflects the pursuit of profit over all other considerations, and it supports imposing a sentence of meaningful imprisonment.

Nevertheless, the government recognizes that the defendant appears to have lived an otherwise generally law-abiding life prior to the charges in this case—with one possible exception. In 2012, it appears that the defendant was charged with various drug and child endangerment-like offenses in San Diego, California. PSIR ¶ 42. The defendant stated that he sustained a conviction, although the Probation Officer has not been able to locate additional records related to this past conduct. *Id.* Absent greater clarity, the government is not requesting that the Court consider this disposition in determining the defendant's sentence. The government also acknowledges that the defendant appears to have a challenging home environment, as outlined in his sealed sentencing memo. Doc. No. 34 at 40-42. The government concedes that the defendant's criminal history and

6

personal circumstances, including his documented health issues, militate against a lengthy period of incarceration.

At bottom, a just punishment in this case is one that accounts for the substantial gravity of the defendant's crimes, while taking into account the relevant characteristics of his personal history. In that regard, it is the government's view that the nature of the defendant's crimes and the need for the sentence to reflect the seriousness of his offenses outweigh the defendant's personal circumstances and the challenges his family (like most other criminal defendants' families) would face if he were sent to prison. *See* 18 U.S.C § 3553(a)(1) & (2)(A). As such, these factors support imposition of a sentence of incarceration of not greater than 30 months.

### 2. The Need for the Sentence to Promote Respect for the Law and to Afford Adequate Deterrence

There is little question that the defendant's involvement in this case will help ensure that he respects the law going forward and will not become a recidivist. His acceptance of responsibility standing alone reflects a willingness to put his crimes behind him and move on with his life as a productive member of society.

But such an outcome is not a foregone conclusion. That is true because the conduct in this case is relatively easy to replicate—the barriers to entry are quite low and, as a result, can be very alluring. Overseas suppliers of illegal drugs are plentiful. The defendant may never do business with his prior suppliers again, but there are, and likely always will be, other suppliers in China and other foreign countries waiting to send shipments to the United States. Those suppliers and their relatively cheap drug supplies are not hard to find, and the mark-up for customers in the United States can be significant—as evidenced by the defendant's admitted gains in excess of $550,000 and his substantial forfeiture obligations totaling approximately $780,000. There is little doubt that the defendant will continue to have access to the internet, directly or indirectly, and at some

point he may once again feel the pull of easy money. The sentence in this case should serve to deter him from indulging such an impulse.

Moreover, a sentence that includes a period of meaningful incarceration will promote general deterrence. If the defendant, can find his way into the world of illicit online drug sales— anyone can. Although the defendant's crimes required the use of certain technical means, they did not require any particular sophistication. An appropriate sentence in this case, thus, will ensure that other would-be purveyors of overseas-supplied drugs, regardless of their technical aptitude, are deterred from following the defendant's path. As such, the seriousness of the defendant's conduct demonstrates the need for a sentence involving imprisonment of no more than 30 months as a means to promote respect for the law, as well as specific and general deterrence. 18 U.S.C. § 3553(a)(2)(A) & (a)(2)(B).

### 3. The Need to Avoid Unwarranted Sentencing Disparities

The defendant focuses the bulk of his sentencing argument on his view that a sentence of imprisonment in this case would create an unwarranted sentencing disparity compared to other cases involving similar conduct—i.e., online "pharmacy" cases, involving defendants who sold misbranded drugs for profit and used the "research purposes only" labeling scheme to fool the FDA. *See* Doc. No. 34 at 25-39. The defendant's argument is misplaced.

Section 3553(a)(6) requires a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The fact that one defendant "can find another case where a defendant charged with a somewhat similar crime and facing the same advisory sentencing range received a sentence outside of the applicable sentencing range does not make [the original defendant's] within-Guidelines sentence unreasonable." *United States v. Jimenez*, 513 F.3d 62, 91 (3d Cir. 2008). Indeed, "[r]easonableness is a range." *Id.* Further, the "need to

8

avoid unwarranted sentence disparities" is "just one factor (if relevant) that should be balanced against the others (again, if relevant)." *United States v. Charles*, 467 F.3d 828, 833 (3d Cir. 2006).

A defendant raising § 3553(a)(6) as a basis for a below-Guidelines sentence bears the burden to establish that his "circumstances *exactly paralleled* those of the defendants" who received significantly lower sentences. *United States v. Vargas*, 477 F.3d 94, 100 (3d Cir. 2007) (citing *Charles*, 467 F.3d at 833 n.7) (emphasis added). In other words, a defendant invoking § 3553(a)(6) must affirmatively show that other defendants who received lesser sentences are similarly situated. *Charles*, 467 F.3d at 833; *see also United States v. Bungar*, 478 F.3d 540, 543 (3d Cir. 2007).

Here, the defendant has provided the Court with a laundry list of misbranding cases where the defendants sold various substances to individual consumers—who appear to have known exactly what they were buying—and used the "research purposes only" tag to conceal the conduct from the FDA. Doc. No. 34 at 25-39. But the similar *operation* of these other defendant's crimes does not support a conclusion that those cases "exactly paralleled" the conduct in this case as required to establish a basis for a variance under § 3553(a)(6). *Vargas*, 477 F.3d 100.

As far as one can tell from reading the defendant's sentencing memorandum and related exhibits, none of the cases he cites as a basis for seeking a variance under § 3553(a)(6) involved the same types of dangerous drugs at issue in this case. Indeed, as the defendant admitted during his plea hearing, "[b]enzodiazepines are a class of drugs that produce central nervous system depression" and "carry risks of dependency, toxicity, and even fatal overdose, particularly when combined with other central nervous system depressants." PSIR ¶ 13. The defendant sold two benzodiazepines—clonazolam and diclazepam. A third drug available for purchase on the defendant's website was flubromazolam, "a benzodiazepine derivative that carries increased risk of harm to users due to its ability to produce strong sedation and amnesia at low doses." *Id.*

9

Likewise, he also sold etizolam, a drug known as a thienodiazepine—i.e., a class of drugs chemically related to benzodiazepines that carry similar health risks. *Id.*

Tellingly, the defendant omits from his sentencing memorandum *any* reference to the drugs he actually sold (after smuggling them into the United States), focusing instead on *other* drugs sold by *other* defendants. In doing so, he fails to carry his burden to establish that any of the cases actually involved similarly situated defendants within the meaning of § 3553(a)(6). As to some of the purportedly similar cases he highlights, the defendant simply does not specify what drugs were at issue. Moreover, the vast majority of the drugs that he does specify appear to be sexual dysfunction drugs, diet drugs, or drugs used by bodybuilders—but not benzodiazepines, their derivates, or close chemical analogues:

| **Case** | **Misbranded Drugs** |
|---|---|
| *United States v. Dos Santos, et al.* (S.D. Fla.) | Erectile dysfunction and other unspecified drugs |
| *United States v. Manansingh* (D. Md.) | Unspecified drugs used to enhance customers physiques or otherwise affect the structure or function of their bodies |
| *United States v. Hudgins* (D. Hawaii) | PT-141 (Bremelanotide), IGF-1, Melanotan-II, and Alflutop[1] |
| *United States v. Marsala, et al.* (W.D.N.C.) | Various unspecified compounds containing the active ingredients in prescription drugs, amino/acids, peptides, drugs, reagent chemicals, laboratory and research supplies |
| *United States v. Higdon* (W.D. Pa.) | Unspecified chemicals |
| *United States v. Waite* (S.D. Tex.) | Peptides[2] |
| *United States v. Settineri* (E.D.N.Y.) | Melanotan-II |
| *United States v. Keightly* (M.D. Pa.) | Peptides[3] |
| *United States v. Gill* (W.D. Va.) | Peptides, supplements, dimethylamyline, and SARM-3D, a supplement containing the drug ostarine[4] |
| *United States v. Cavell* (M.D. Pa.) | 2,4-Dinitrophenol (DNP) |
| *United States v. Berube* (E.D.N.Y.) | Unspecified research chemicals |

---

[1] Open source research indicates these drugs appear to be used to treat sexual dysfunction (PT-141), help with tanning (Melanotan-II), increase lean body mass (IGF-1), or reduce joint inflammation (Alflutop).
[2] The sentencing transcript attached to the defendant's memorandum references "peptides," Doc. No. 34, Ex. C at 4, which are abused by athletes and bodybuilders.
[3] *See* Doc. No. 34, Ex. D (*Keightly* Information).
[4] Dimethylamyline and SARM-3D appear to be substances abused by bodybuilders.

| Case | Misbranded Drugs |
|---|---|
| *United States v. Smith* (D. Md.) | Peptides and the active ingredients contained in certain prescription drugs |

Doc. No. 34 at 25-39.

To be sure, the chemicals at issue in the cases cited by the defendant may have placed those who consumed them in harms way. And it is certainly valid for a defendant charged with a misbranding offense related to chemicals used, for example, by bodybuilders to build muscle mass to argue that he should be treated similarly to other defendants convicted of selling the same type of misbranded drugs. But drugs used by bodybuilders or individuals seeking a treatment for sexual dysfunction are not the same—and the government is aware of no case treating them as the same—as the benzodiazepines and related drugs pedaled by the defendant to customers looking for the high associated with those drugs. As the defendant well knew or should have known, *see* Ex. 1, some of his customers were addicts, and the defendant's shipments put their lives at risks, prompting loved ones to make desperate pleas to the defendant's company. Those pleas appear to have fallen on deaf ears.[5]

In short, the defendant has failed to carry his burden to establish that his case "exactly paralleled" the other cases he cites in his sentencing memorandum. Moreover, § 3553(a)(6) only seeks to avoid "unwarranted" sentencing disparities. To the extent the Court were to conclude that the defendant's conduct renders him similarly situated to the defendants he highlights who received little or no imprisonment, a meaningful term of imprisonment in this case would not amount to an "unwarranted" disparity in light of the specific type of drugs the defendant smuggled

---

[5] In addition to the material difference in the type of misbranded drugs, there are other reasons why the defendant's § 3553(a)(6) argument should fail, including the fact that the defendant was convicted of a conspiracy offense in which he has admitted being an organizer or leader (resulting in a two-level enhancement under § 3B1.1(c)). Only one of the cases cited by the defendant (*Waite*) involved a conspiracy charge, and it is unclear from the defendant's sentencing memorandum whether the defendant occupied a position similar to the defendant in this case. Suffice to say, a defendant who is an organizer of a leader is not similarly situated to a defendant who acted alone.

11

into the country and sold to anyone with an internet connection. Thus, as the Supreme Court has said, "[when] the District Judge correctly calculate[s] and carefully review[s] the Guidelines range, he necessarily g[ives] significant weight and consideration to the need to avoid unwarranted disparities." *Gall v. United States*, 552 U.S. 38, 54 (2007). The Guidelines range is appropriately calculated here, as the defendant concedes. Doc. No. 34 at 4 ("Mr. Ash concedes this total offense level."). Therefore, the agreed-upon, correct[6] calculation "necessarily" takes into account the "need to avoid unwarranted disparities" under § 3553(a)(6), and the defendant has failed to establish a basis under that subsection to vary below 30 months' imprisonment.

---

[6] The defendant expends significant energy discussing the ways various courts have calculated loss under § 2B1.1 for misbranding offenses, including in cases where customers appear to have gotten what they bargained for (i.e., were not affirmatively defrauded). Doc. No. 34 at 5-21. In the defendant's view, because various courts in other circuits have held that there is no actual loss under the Guidelines in misbranding cases where customers are not deceived, the special rule that permits use of gross revenues as a proxy for loss—Application Note 3(F)(v)—does not apply and the total Guidelines loss is therefore zero. *See, e.g*, *id.* at 18-19 ("Thus, the *Bays* court reached the holding implicit in the history and language of the special rule: namely, that the special rule is a method of *calculating* loss, but that it does not come into play unless and until there is first found to be an actual or intended loss.") (citing *United States v. Bays*, 765 F. App'x 945 (5th Cir. Feb. 27, 2019) (unpublished)). Nevertheless, as the defendant acknowledges, Doc. No. 34 at 19-20, the Third Circuit has actually addressed this issue in a published opinion, holding that the special rule *does* apply to misbranding offenses (without regard to the question of whether any customers were deceived). *United States v. Goldberg*, 538 F.3d 280, 290-91 (3d Cir. 2008) ("Goldberg was selling goods for which regulatory approval was required but not obtained. Therefore, under cmt. 3(F)(v), the District Court's gross profits methodology was proper."). Despite the defendant's attempts to undermine *Goldberg* and its reasoning—including by highlighting how courts not bound by the decision discounted its holding—the fact remains that *it is the law in this circuit*. For that reason, the defendant had little choice but to agree to a Guidelines calculation that took into account his revenues. He has agreed to the calculation because it is correct in this circuit. Likewise, to the extent the defendant contends that the agreed-upon loss overstates the offense in this case, the balance of the relevant § 3553(a) factors, as articulated above, establish that a term of meaningful imprisonment is wholly appropriate to redress the defendant's wrongdoing in this case.

**III.** **<u>Conclusion</u>**

For the foregoing reasons, the Court should impose a sentence of meaningful imprisonment that does not exceed the bottom of the applicable Guidelines range—i.e., 30 months. Such a sentence is one that would be sufficient but not more than necessary to effectuate the goals of federal sentencing and, in particular, address the defendant's reckless conduct over a period of years.

Respectfully submitted,

SCOTT W. BRADY
United States Attorney

s/Eric G. Olshan
ERIC G. OLSHAN
Assistant U.S. Attorney
Joseph F. Weis, Jr. U.S. Courthouse
700 Grant Street, Suite 4000
Pittsburgh, Pennsylvania 15219
(412) 894-7446 (Phone)
(412) 644-4549 (Fax)
eric.olshan@usdoj.gov
IL ID No. 6290382